ORDERED.

**Dated: July 14, 2020**

Caryl E. Delano
Chief United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION
www.flmb.uscourts.gov

In re:                                                                Case No. 9:18-bk-01732-FMD
                                                                       Chapter 7
Andrew Oscar Delgado and
Ivette Mercedes Delgado,

      Debtors.
_____/

Crystal Blue, LLC,

      Plaintiff,

v.                                                                    Adv. Pro. No. 9:18-ap-583-FMD

Andrew Oscar Delgado and
Ivette Mercedes Delgado,

      Defendants.
_____/

## FINDINGS OF FACT, CONCLUSIONS OF LAW,
## AND MEMORANDUM OPINION

THIS PROCEEDING came before the Court for trial on February 18 and February 21, 2020,

on Plaintiff's Amended Complaint objecting to Debtors' discharge under 11 U.S.C. §§ 727(a)(2),

727(a)(3), 727(a)(4), and 727(a)(5).[1] The Court, having carefully considered the evidence and the parties' post-trial briefing, finds that Plaintiff has not met its burden under Federal Rule of Bankruptcy Procedure 4005 to prove its objections to Debtors' discharge by a preponderance of the evidence.

### A.    Facts

The evidence at trial established the following facts:

In 2013, Debtors, Andrew Delgado and Ivette Delgado ("Debtors") formed Andrew Hunter Holdings, LLC ("AH Holdings").[2] In 2013 and 2014, AH Holdings entered into land sale contracts to purchase three properties from Tracey and Mara Dewrell (the "Dewrells"):  a lot in Naples, Florida, for $50,000.00,[3] a second lot in Naples for $7,000.00[4] (together, the "Naples Lots"), and 1.17 acres on Everglades Blvd. in Naples (the "Everglades Property") for $7,000.00.[5] In March 2016, AH Holdings entered into a contract to purchase a parcel of land and a mobile home in Fair Play, South Carolina (the "South Carolina Property") for $170,000.00.[6] Together, these contracts are referred to as the "Land Sale Contracts."

Prior to 2015, Debtors formed Andrew Hunter Homes, LLC ("AH Homes"). AH Homes was in the business of constructing custom single-family homes. On March 10, 2017, in connection with a business relationship with Crystal Blue, LLC ("Plaintiff"), AH Homes executed a promissory note in favor of Plaintiff's principal, Chen K. Su ("Mr. Su"), in the amount of $500,000.00 (the "Promissory Note"). Debtors signed a guaranty of the Promissory Note. On February 9, 2018, Mr. Su executed an assignment of the Promissory Note to Plaintiff.[7]

---

[1] Doc. No. 29. Unless otherwise stated, citations to statutes are to the United States Bankruptcy Code, 11 U.S.C. § 101, *et seq.*
[2] Debtors' Ex. 96, pp. 2-3.
[3] Debtors' Ex. 92, pp. 2-4.
[4] Debtors' Ex. 92, pp. 11-13.
[5] Debtors' Ex. 91, pp. 2-4.
[6] Debtors' Ex. 94, pp. 2-10.
[7] Plaintiff's Claim No. 2, Part 2, pp. 8-15, Main Case No. 9:18-bk-01732-FMD (hereinafter "Main Case").

Debtors testified at trial that, by agreement, Mr. Su assumed certain management responsibilities for AH Homes, including funding its operational expenses through moneys advanced under the Promissory Note.

AH Homes and another entity owned by Debtors, Marco Island Design Center, LLC ("Design Center") conducted business in a showroom located in Marco Island, Florida (the "Showroom"). But by September 2017, AH Homes no longer conducted its business in the Showroom.

In September 2017, Hurricane Irma devastated Southwest Florida, including Marco Island, damaging the Showroom and destroying a storage unit where Debtors stored books and records. Debtors testified at trial that the books and records stored in the storage unit were completely destroyed. Photographs of the destruction, including what appear to be Bankers Boxes of documents, were admitted into evidence.[8]

AH Homes and Design Center were the named insureds on an insurance policy covering the Showroom. The damage to the Showroom caused by Hurricane Irma gave rise to an insurance claim (the "Insurance Claim").[9]

In September 2017, Debtors changed AH Holdings' name to Residential Renovation and Restoration, LLC.[10] Later, in February 2018, Debtors changed the name a second time, to RRR Management & Consulting LLC.[11] Mrs. Delgado testified at trial that the second name change was because the name "Residential Renovation and Restoration, LLC," was too cumbersome. This single entity is referred to herein as "RRR."

---

[8] Debtors' Ex. 88.
[9] Plaintiff's Ex. 2.
[10] Debtors' Ex. 96, pp. 8-12.
[11] Debtors' Ex. 96, pp. 24-28.

In October 2017, RRR opened a bank account at Wells Fargo, Account #5507.[12] Between October 5, 2017 and December 22, 2017, numerous checks were written on Wells Fargo Account #5507 made payable to Mr. Delgado or to Mrs. Delgado. Some of the checks included the notation "Member Draw."[13] Other checks included notations such as "Materials Hurricane,"[14] "Materials,"[15] "Design Center Cleanup,"[16] and "Materials Pickup."[17]

On November 29, 2017, Mr. Delgado emailed Mrs. Dewrell regarding documents needed to sell the Everglades Property.[18] On November 30, 2017, Mrs. Dewrell emailed Mr. Delgado and the closing agent to advise that the Dewrells would sign a quitclaim deed of the Everglades Property in exchange for the payoff amount of $1,811.17.[19] On December 11, 2017, RRR paid $1,954.00 to the Dewrells, and they delivered a quitclaim deed transferring title to the Everglades Property to Mr. Delgado.[20]

The email correspondence between Mr. Delgado and Mrs. Dewrell prior to the date of the quitclaim deed indicates that Mrs. Dewrell suggested the intermediate deed to Mr. Delgado in response to his inquiry about the closing documents, based on her mistaken belief that Debtors had been the original buyers.[21] On December 19, 2017, Mr. Delgado signed a quitclaim deed of the Everglades Property to Joseph J. Billi ("Mr. Billi"), a former business associate.[22] At his deposition,

---

[12] Plaintiff's Ex. 5, p. 3.
[13] *E.g.*, Plaintiff's Ex. 5, pp. 88, 92, 96.
[14] Plaintiffs' Ex. 5, p. 86.
[15] Plaintiff's Ex. 5. p. 85.
[16] Plaintiff's Ex. 5, p. 81.
[17] Plaintiff's Ex. 5. p. 102.
[18] Plaintiff's Ex. 3, pp. 18-19.
[19] Plaintiff's Ex. 3, pp. 17-18.
[20] Debtors' Ex. 91, p. 5; Plaintiff's Ex. 3, p. 11.
[21] Plaintiff's Ex. 3, pp. 13-20.
[22] Debtors' Ex. 91, p. 6.

Mr. Billi testified that RRR owed money to his business, Duke's Appliances, and that the Everglades Property was deeded to him in payment of that debt.[23]

On January 29, 2018, Mr. Delgado wrote a $250.00 check to his bankruptcy attorney with "personal 13" written on the subject line.[24] On February 1, 2018, just three days after he apparently consulted with a bankruptcy attorney, Mr. Delgado signed three "Contract/Agreement Assignments" (the "Assignments") in which "Andrew Hunter Holdings LLC/Andrew Delgado" assigned the two Land Sale Contracts for the Naples Lots to Mrs. Delgado's mother, Mercedes Medina, [25] and the Land Sale Contract on the South Carolina Property to Mr. Delgado's mother, Belkis Delgado.[26]

On February 7, 2018, Debtors deposited their 2016 income tax refund in the amount of $25,082.24 into their joint bank account ("Joint Account #3941") at Fifth Third Bank ("Fifth Third").[27]

Between February 8 and February 12, 2018, $17,860.00 was transferred from Debtors' Joint Account #3941 to Mrs. Delgado's separate account at Fifth Third ("Account #3612").[28]

On February 27, 2018, Mr. Delgado caused AH Homes to file a Chapter 7 petition.[29] Robert Tardif was appointed as the Chapter 7 trustee. AH Homes' bankruptcy schedules, signed by Mr. Delgado, did not list the Insurance Claim as an asset.

On March 1, 2018, Mr. Delgado took a cash withdrawal of $31,126.14 from RRR's checking account ("Account #5507") at Wells Fargo Bank ("Wells Fargo").[30] Debtors contend that most of the

---

[23] Debtors' Ex. 89, Transcript pp. 29:24-30:3.
[24] Plaintiff's Ex. 6, p. 323.
[25] Plaintiff's Ex. 3, pp. 9-10.
[26] Debtors' Ex. 94, p. 11.
[27] Plaintiff's Ex. 6, pp. 57, 244-45, 250-51.
[28] Plaintiff's Ex. 6, pp. 52-53, 123, 129.
[29] Case No. 9:18-bk-01399-FMD.
[30] Plaintiff's Ex. 5, p. 29.

withdrawn funds were used to pay a subcontractor of RRR and to pay rent for the Showroom. Debtors'

Exhibit 26 consists of four cashier's checks dated March 1, 2018:

| | |
|---|---|
| Andrew Delgado | $450.00 |
| Belkis Delgado | $2,000.00 |
| One Step Handy Man | $26,700.00 |
| Stey Dreams Investments (rent) | $1,936.14.[31] |

On March 7, 2018 (the "Petition Date"), Debtors filed a petition under Chapter 13 of the

Bankruptcy Code.[32] Fifth Third's records indicate that on the Petition Date, Debtors' Joint Fifth Third

Account #3941 had a balance of $22.51, and Mrs. Delgado's Fifth Third Account #3612 had a

negative balance of ($5.01).[33] This means that between February 8, 2018, and March 7, 2018, Debtors

spent nearly all of the $25,082.24 tax refund deposited to Joint Account #3941, $17,860.00 of which

had been transferred Mrs. Delgado's Account #3612 at Fifth Third.

The bank statement for Account #3612 for February 10 through March 9, 2018, indicates that

Mrs. Delgado wrote checks on the account totaling $12,918.25, with the largest being $3,400.00 to

RRR and two checks totaling $2,995.00 to Debtors' bankruptcy attorney. The balance of the

disbursements from the account were made by debit card to purchase groceries, fast food, clothing,

and to pay State Farm and Verizon.[34]

In their initial bankruptcy schedules, Debtors stated that Mr. Delgado was employed by RRR

as its construction manager/consultant and Mrs. Delgado was employed as RRR's office manager. In

their Schedule I: Income, Debtors stated that they each received gross wages from RRR in the amount

of $4,767.00 per month and that Mrs. Delgado receives regular support payments of $1,015.40 per

---

[31] Debtors' Ex. 26.
[32] Debtors' Ex. 1.
[33] Plaintiff's Ex. 6, pp. 51, 124.
[34] Plaintiff's Ex. 6, pp. 120-124.

month.[35] On their Schedule J: Expenses, Debtors listed four dependents and monthly expenses that exceeded their income by over $2,500.00 per month.

Debtors' monthly expenses included rent of $2,200.00, food of $1,000.00, medical and dental of $500.00, life insurance of $256.00, health insurance of $2,857.62, vehicle insurance of $989.00, car payments on three cars totaling over $1,100.00 per month, and transportation expenses (gas and maintenance) of $600.00.[36]

Debtors' schedule of assets reveals that they do not own a home.[37] Debtors disclosed cash in the amount of $20.00 and four bank accounts containing a total of $315.00. Debtors also disclosed their interests in four limited liability companies,[38] including RRR, each having a value of "$0.00," with descriptive information as follows:

> Kage Holdings LLC [referred to herein as "**Kage**"] (never operated)
>
> Andrew Hunter Homes LLC ["**AH Homes**"] (in Chapter 7, 9:18-bk-01399, liabilities exceed assets)
>
> RRR Construction Management and Consulting LLC ["**RRR**"]
> (assets - $300 bank account, possible $20,000 insurance claim for hurricane damage)
> (debts – 24-month building lease $1900/month, 22 months left)
>
> Andrew Hunter Holdings LLC ["**AH Holdings**"]
> (assets:  Agreement for Deed for vacant lot at Summer Breeze Ct., Lot 41, Cedar Grove Estates, Townville, SC – value approx. $12,000)
> (debts:  money owed on above Agreement of $19,233.76)

---

[35] Debtors' Ex. 1, pp. 32-33.
[36] Debtors' Ex. 1, pp. 34-35.
[37] Debtors' Ex. 1, pp. 9-10.
[38] Debtors' Ex. 1, pp. 13-14. The limited liability companies were incorrectly listed on Debtors' schedules as interests in "bonds, mutual funds, or publicly traded stocks," rather than interests in "non-publicly traded stock and interests in incorporated and unincorporated business, including an interest in an LLC, partnership, and joint venture."

For some reason, although RRR and AH Holdings are the same entity, Debtors listed them in their bankruptcy schedules as separate entities.[39]

In response to Question 18 on their initial Statement of Financial Affairs ("SOFA"),[40] Debtors disclosed that they had made the following transfers within two years of filing for bankruptcy:

| Person Who Received Transfer Address<br><br>Person's relationship to you | Description and value of property transferred | Describe any property payments received or debts paid in exchange | Date transfer was made |
|---|---|---|---|
| Mercedes Medina<br><br>wife's mother | "rent to own" leases of 2 Collier County lots (approx. value of $30,000) | approx. $30,000 owed | Jan 2018 |
| Belkis G. Delgado<br><br>husband's mother | "rent to own" mobile home in South Carolina (approx. value of $35,000) | approx. $84,000 owed | Jan 2018 |

Debtors filed a Chapter 13 plan in which they proposed to pay to the Chapter 13 Trustee the sum of $100.00 per month for sixty months.[41]

On April 2, 2018, RRR's Wells Fargo Account #5507 was garnished by RobinsonLaw, a judgment creditor of Mr. Delgado and AH Homes.[42] Debtors testified that on April 11, 2018, RRR opened Account #1122 at Branch Banking & Trust ("BB&T"), because RRR was unable to use the funds in the garnished Wells Fargo account.[43]

---

[39] Debtors contend that "they listed them separately since they had two separate tax IDs, and the Debtors believed they were two separate companies." (Doc. No. 81, p. 6.)
[40] Debtors' Ex. 1, p. 41.
[41] Main Case, Doc. No. 2.
[42] Debtors' Ex. 27 (garnishment action final judgment); Debtors' Ex. 25, p. 33 (Wells Fargo bank statement). The bank statement entry on April 2, 2018, indicates a "Legal order debit" of $7,541.44 pursuant to case # 31743718.
[43] Plaintiff's Ex. 4, pp. 40-41.

On April 13, 2018—after Debtors filed their SOFA—Mrs. Dewrell sent Mr. Delgado an email stating that she had not consented to the Assignments of the Naples Lots to Mercedes Medina, as required by the original Land Sale Contracts.[44]

On May 24, 2018, an insurance claims adjuster issued a check for $55,542.34 payable to AH Homes and Design Center in settlement of the Insurance Claim.[45] On May 31, 2018, the adjuster issued a second check in the amount of $13,885.59, again payable to AH Homes and Design Center in settlement of the Insurance Claim.[46] At trial, Debtors testified that they believed RRR—not AH Homes—was entitled to the $69,427.93 total insurance proceeds (the "Insurance Proceeds") because RRR was the only business operating at the Showroom when the hurricane damage occurred.[47]

On May 31, 2018, the Chapter 13 Trustee in Debtors' bankruptcy case filed an Unfavorable Recommendation and Objections to Confirmation of Plan, requesting Debtors' 2017 income tax return and other documents.[48] Although Debtors had provided the Chapter 13 Trustee with their 2015 and 2016 income tax returns, both of which reflected significant tax refunds,[49] they had not provided the Chapter 13 Trustee with their 2017 income tax return.[50] However, during March, April, and May 2018, Debtors did provide the Chapter 13 Trustee with profit and loss statements for AH Holdings and AH Homes and with 2015 and 2016 income tax returns for AH Holdings and AH Homes.[51]

On June 8, 2018, Debtors deposited the Insurance Proceeds into RRR's Wells Fargo Account #5507.[52] Over the next several months, RRR used the Insurance Proceeds to pay RRR's business

---

[44] Plaintiff's Ex. 3, p. 8.
[45] Plaintiff's Ex. 2, pp. 68-69.
[46] Plaintiff's Ex. 2, pp. 66-67.
[47] Doc. No. 81, p. 7.
[48] Plaintiff's Ex. 32.
[49] Debtors' Exs. 3, 4.
[50] Debtors' Ex. 14.
[51] Debtors' Exs. 6 through 13.
[52] Plaintiff's Ex. 5, p. 42.

expenses, to reimburse themselves and Mr. Delgado's mother, and to pay their bankruptcy attorney's fees.[53] The statement for Wells Fargo Account #5507 reflects checks written between June 8, and June 30, 2018, some with notes, as set forth below:

| | |
|---|---|
| N&M Services (Haabestad stucco damaged) | $1,750.00 |
| Zinn Law | $2,500.00 |
| Mr. Billi (appliance damages) | $2,900.00 |
| Mr. Delgado (loan) | $9,000.00 |
| Stey Dreams (rent) | $3,872.29 |
| Belkis Delgado (furniture damaged) | $8,765.00 |
| Mr. Delgado (tools purchased damage) | $2,910.36 |
| C3 insurance adjuster | $6,500.00 |
| Zinn Law | $4,550.00[54] |

On June 22, 2018, Debtors filed a motion to convert their Chapter 13 case to a Chapter 7 case.[55] The Court entered an order converting the case to Chapter 7 on July 2, 2018. Robert Tardif, the trustee in the AH Homes case, was appointed as the trustee in Debtors' case (the "Chapter 7 Trustee").[56]

On June 30, 2018, three weeks after the deposit of the Insurance Proceeds of $69,427.93 into RRR's Wells Fargo Account #5507, the account balance was $5,297.69.[57]

On July 6, 2018, Debtors filed an amended Schedule I: Income and Schedule J: Expenses.[58] Their amended Schedule J included changes to their monthly expenses and reflects that they were no longer paying for medical insurance of $2,957.92 per month. However, the amended Schedule J still reflected a monthly shortfall, reduced from the $2,558.59 deficit stated on Debtors' original Schedule J to a deficit of $551.97 per month.

---

[53] Debtors' Ex. 95.
[54] Debtors' Ex. 95; Plaintiff's Ex. 5, p. 42.
[55] Main Case, Doc. No. 47.
[56] Debtors' Ex. 16. A different trustee initially was appointed upon the conversion of Debtors' case, but that trustee withdrew from the case and the United States Trustee appointed Robert Tardif as the new Trustee.
[57] Plaintiff's Ex. 5, p. 42.
[58] Debtors' Ex. 17.

On August 13, 2018, Debtors filed a second amended summary of assets, Schedule A/B: Property, Schedule D: Secured Creditors, and Schedule J: Expenses. These amendments reflected that that one of Debtors' vehicles had been totaled in an accident and they had purchased a new vehicle.[59]

The § 341 meeting of creditors in Debtors' converted Chapter 7 case was scheduled for August 14, 2018. The Chapter 7 Trustee requires debtors to provide financial documentation to him, including complete bank statements covering the 90 days prior to the date of filing bankruptcy, in advance of the § 341 meeting of creditors.[60] On August 14, 2018, the Chapter 7 Trustee conducted and concluded Debtors' meeting of creditors under § 341. On September 13, 2018, the Chapter 7 Trustee submitted a Report of No Distribution in the case, stating that there is no property available for distribution from the estate.[61]

On November 9, 2018, Debtors filed a third amended Schedule A/B: Property, disclosing that RRR, postpetition, had received the Insurance Proceeds and had used the proceeds to pay RRR's debts. Specifically, Debtors listed RRR's assets ($300.00 in its bank account, plus the Insurance Proceeds in the "gross amount received" of $69,427.93) and RRR's liabilities (22 months remaining on building lease and a judgment owed to RobinsonLaw). Debtors' amended Schedule A/B provided the following information regarding RRR's disposition of the Insurance Proceeds:

> $52,286.18 in debts paid post-petition from insurance claim money which includes insurance adjuster, repayment of damage to contractors' and family's display items, tools and materials, payroll, insurance premiums, truck loans, rent, and administrative expenses.[62]

Also on November 9, 2018, Debtors filed a first amended SOFA (the "Amended SOFA"). In the Amended SOFA, Debtors disclosed, first, that it was AH Holdings that had assigned the Land

---

[59] Debtors' Ex. 23.
[60] http://www.flmb.uscourts.gov/thesource/trustee7/doc/TARDIFF%20ROBERT%20Trustee%20Doc%20Letter%20(Tardif).pdf.
[61] Main Case, Docket entry dated September 13, 2018.
[62] Debtors' Ex. 24, p. 10.

Sale Contracts of the Naples Lots and the South Carolina Property (rather than Debtors as stated in their original SOFA) and, second, that the contract for the Everglades Property, "previously titled in the name of AH Holdings," had been transferred to Mr. Billi in December 2017 to repay a debt owed to him by RRR.[63]

### B.    Plaintiff's Amended Complaint

In Count I of the Amended Complaint, Plaintiff objects to Debtors' discharge under § 727(a)(2). Plaintiff alleges that Mr. Delgado fraudulently transferred the Everglades Property to Mr. Billi on December 19, 2017, and that Debtors concealed income that they received from RRR with the intent to defraud their creditors.

In Count II, Plaintiff objects to Debtors' discharge under § 727(a)(3) for the concealment or failure to keep books and records from which Debtors' financial condition might be ascertained. Plaintiff alleges that Debtors use RRR as their alter ego, and that they concealed or failed to maintain documents showing the amounts received by RRR from its "only client," EZ General Roofing.

In Count III, Plaintiff objects to Debtors' discharge under § 727(a)(4) for Debtors' alleged false oaths made knowingly and fraudulently in connection with the bankruptcy case. Plaintiff alleges that Debtors made false oaths in their schedules and SOFA and at their § 341 meeting and examinations under Federal Rule of Bankruptcy Procedure 2004 regarding the Insurance Claim they listed in their schedules as an asset of RRR, the transfers to Mercedes Medina listed in their initial SOFA, and the transfer of the Everglades Property to Mr. Billi.

In Count IV, Plaintiff objects to Debtors' discharge under § 727(a)(5) for Debtors' alleged failure to satisfactorily explain the loss of assets to meet Debtors' liabilities, including Debtors' alleged failure to explain how RRR's income was used.

---

[63] Debtors' Ex. 24, pp. 19-20.

Mr. Delgado, Mrs. Delgado, and Mr. Su testified at the trial. Following the trial, the parties submitted post-trial briefs.[64]

### C. Analysis

In order to promote the Bankruptcy Code's policy of providing debtors with a fresh start, objections to discharge are construed liberally in favor of the debtor and strictly against the objecting party.[65] Additionally, "[b]ecause denial of discharge is so drastic a remedy, courts may be more reluctant to impose it than to find a particular debt nondischargeable."[66] Denial of a debtor's discharge is a harsh and drastic penalty that is reserved for the most egregious misconduct by a debtor.[67]

Under Federal Rule of Bankruptcy Procedure 4005, "[a]t the trial on a complaint objecting to a discharge, the plaintiff has the burden of proving the objection."[68] The party objecting to a debtor's discharge under § 727(a) bears the burden of proving each element of its objection by a preponderance of the evidence.[69]

### a. Count I – 11 U.S.C. § 727(a)(2)

Under § 727(a)(2), the Court shall grant the debtor a discharge unless the debtor transferred or concealed property within one year before the bankruptcy with the intent to hinder, delay, or defraud a creditor.[70] For a debtor's discharge to be denied under § 727(a)(2), a plaintiff must prove (1) that the challenged act was done within one year of the bankruptcy, (2) with actual intent to hinder,

---

[64] Doc. Nos. 80, 81, 82.

[65] *In re Coady*, 588 F.3d 1312, 1315 (11th Cir. 2009); *In re Bryan*, 612 B.R. 618, 624 (Bankr. N.D. Okla. 2020).

[66] *In re Gonzalez*, 302 B.R. 745, 751 (Bankr. S.D. Fla. 2003)(citing *In re Johnson*, 98 B.R. 359, 367 (Bankr. N.D. Ill. 1988)("The denial of discharge is a harsh remedy to be reserved for a truly pernicious debtor.")(citation omitted)).

[67] *In re Beard*, 595 B.R. 274, 289-90 (Bankr. E.D. Ark. 2018)(citations omitted).

[68] Fed. R. Bankr. P. 4005.

[69] *In re Moore*, 559 B.R. 243, 254 (Bankr. M.D. Fla. 2016)(citing *Grogan v. Garner*, 498 U.S. 279, 287-88, 111 S. Ct. 654, 112 L. Ed. 2d 755 (1991)).

[70] 11 U.S.C. § 727(a)(2).

delay, or defraud a creditor, (3) that the act was the debtor's act, and (4) that the act amounted to transferring, removing, or concealing the debtor's property.[71]

With respect to the second and fourth elements, the plaintiff "bears the considerable burden of demonstrating *actual fraudulent intent*; constructive fraud is insufficient,"[72] and the property must have been property of the debtor or the estate—not property belonging to some entity other than the debtor—even if the transfer had some incidental effect on the debtor's assets.[73]

In its Post-Trial Brief, Plaintiff asserts that Mr. Delgado transferred the Everglades Property to Mr. Billi in December 2017, and that the transfer constitutes a fraudulent concealment under § 727(a)(2).[74]

The Court finds that Plaintiff has not met its burden under § 727(a)(2) for two reasons. First, Plaintiff did not prove that the property transferred—the Everglades Property—was Debtors' property. It was AH Holdings, not Debtors, that entered into the Land Sale Contract of the Everglades Property with the Dewrells.

And second, Plaintiff did not prove that the Everglades Property was transferred to Mr. Billi with actual fraudulent intent. Mr. Delgado testified that he transferred the Everglades Property to Mr. Billi in payment of a debt owed by RRR to Mr. Billi or Mr. Billi's company, Duke's Appliances. Mr. Delgado explained that the debt arose in part from Duke's Appliances' payment of RRR's rent, and in part from damage to appliances owned by Duke's Appliances while they were in the Showroom.[75] Mr. Billi corroborated Mr. Delgado's testimony by testifying at his deposition that AH Homes owed him $35,000.00 for the "Mandela" project, and "RRR or whatever it was" owed him $7,000.00 for

---

[71] *In re Jennings*, 533 F.3d 1333, 1339 (11th Cir. 2008).
[72] *In re Breedlove*, 545 B.R. 359, 379 (Bankr. M.D. Ga. 2016)(emphasis in original).
[73] *In re Geer*, 522 B.R. 365, 386-87 (Bankr. N.D. Ga. 2014).
[74] Doc. No. 80, pp. 1-4.
[75] *See* Doc. No. 44, Declaration of Andrew Delgado, ¶ 18.

rent, so that Mr. Delgado "just said, I'm going to quit deed this land. I feel bad, to put towards the money I owe you."[76]

b.    Count II – 11 U.S.C. § 727(a)(3)

Under § 727(a)(3), the Court shall grant the debtor a discharge unless the debtor has concealed or failed to keep any recorded information from which the debtor's financial condition might be ascertained, unless the failure was justified under the circumstances.[77] For a debtor's discharge to be denied under § 727(a)(3), a plaintiff must prove (1) that the debtor concealed or failed to keep recorded information, and (2) that it is impossible to ascertain his financial condition as a result of his conduct.[78] The focus is on whether the debtor has presented an accurate and complete account of his financial affairs,[79] and the Court has wide discretion to determine whether his presentation is sufficient.[80]

In its Post-Trial Brief, Plaintiff asserts that Debtors concealed or failed to keep books and records by producing only a fraction of their personal bank records, by failing to explain transactions that appeared in the bank records obtained by Plaintiff from the banks, by concealing their 2017 income tax return, and by failing to account for RRR's income.[81] The crux of Plaintiff's claim appears to be that between October 4, 2017 and December 22, 2017, Debtors wrote themselves checks totaling approximately $37,345.00 from RRR's Wells Fargo Account #5507, that between January 6, 2018 and July 6, 2018, Debtors' deposits in their Fifth Third accounts totaled $131,951.76, and that Debtors have failed to accurately account for these amounts.[82]

---

[76] Plaintiff's Ex. 11; Debtors' Ex. 89, Transcript pp. 47, 105-06.

[77] 11 U.S.C. § 727(a)(3).

[78] *In re Rancourt*, 2014 WL 504082, at *3 (Bankr. M.D. Fla. Feb. 7, 2014).

[79] *In re Rancourt*, 2014 WL 504082, at *3(quoting *In re Fasolak*, 381 B.R. 781, 790 (Bankr. M.D. Fla. 2007)).

[80] *In re Rancourt*, 2014 WL 504082, at *3(citing *In re Shahid*, 334 B.R. 698, 706 (Bankr. N.D. Fla. 2005)).

[81] Doc. No. 80, pp. 4-10.

[82] Doc. No. 80, pp. 7-8.

The Court finds that Plaintiff has not met its burden under § 727(a)(3). First, Plaintiff's evidence confuses the period of time within which Debtors' financial condition must be ascertained for purposes of § 727(a)(3). The relevant records are those which "assist the Court and the creditors in determining what the Debtor's financial condition was *as of the Petition Date, and for the recent period prior to the Petition Date*."[83] "The purpose of § 727(a)(3) is 'to give interested parties and the court a reasonably complete picture of the debtor's financial condition during *the period prior to bankruptcy*.'"[84]

Under § 348(f)(2), property of the estate in a case converted from Chapter 13 to another chapter *in bad faith* consists of property of the estate as of the date of the conversion. There has been no allegation or evidence presented that Debtors' conversion of their case from Chapter 13 to Chapter 7 was in bad faith. Therefore, property of the estate in this case is determined as of the original Petition Date—March 7, 2018—and income generated after that date is not relevant unless it is shown that Debtors had an interest in the income as of March 7, 2018. Here,  only  the  Insurance  Proceeds appears to be a prepetition asset, but it was not Debtors' personal asset, and Debtors apparently accounted for the asset to the satisfaction of the Chapter 7 Trustee.

At trial, Plaintiff focused most of its presentation on Debtors' income and transactions during the period after the March 7, 2018 Petition Date. For example, Plaintiff's Exhibit 4 is a composite exhibit of RRR's BB&T Account #1122, which was not opened until April 11, 2018; Plaintiff's Exhibit 5 is a composite exhibit of RRR's Wells Fargo Account #5507 from October 2017 to December 2018; and Plaintiff's Exhibit 6 is a composite exhibit of Debtors' Fifth Third Joint Account

---

[83] *In re Shah*, 388 B.R. 23, 35 (Bankr. E.D.N.Y. 2008)(citing *In re Buzzelli*, 246 B.R. 75, 102-05 (Bankr. W.D. Pa. 2000))(emphasis added).
[84] *In re Hang*, 589 B.R. 234, 246 (Bankr. D.R.I. 2018)(quoting *In re Simmons*, 810 F.3d 852, 857 (1st Cir. 2016))(emphasis added).

#3941 from September 2017 to January 2019 and Mrs. Delgado's Fifth Third Account #3612 from October 2017 to January 2019.

In its Post-Trial Brief, Plaintiff complains about the amount of Debtors' income in April, May, and June 2018—after the Petition Date—and about the aggregate amount of their bank deposits between January 2018 and July 2018, which straddles the Petition Date.[85] Plaintiff's focus on Debtors' postpetition financial affairs is highlighted by its "Closing Demonstrative Aid,"[86] a chronological listing of certain events and monetary transactions from September 2017 through November 2018. Most of the transactions referenced in the Demonstrative Aid took place after Debtors filed their Chapter 13 petition in March 2018.

Further, Plaintiff did not prove that Debtors' conduct made it impossible to ascertain their financial condition in the recent period before the Petition Date. Plaintiff asserts in its Post-Trial Brief that Mrs. Delgado was unable to explain checks written from RRR's Wells Fargo Account #5507 to herself. Specifically, Plaintiff refers to: a November 3, 2017 check in the amount of $2,800.00 for "Admin Services;" a December 22, 2017 check in the amount of $2,400.00 for "Design Center Décor;" and a January 4, 2018 check in the amount of $4,800.00 for "Administrative."[87] The Court finds that Mrs. Delgado's inability to recall relatively small, seemingly routine checks from a business account does not render it impossible to determine Debtors' financial condition.

In its Post-Trial Brief, Plaintiff also complains that Debtors did not provide copies of the checks that are reflected in the bank statements that Plaintiff obtained,[88] and that Plaintiff was compelled to subpoena bank records, including cancelled checks, from Fifth Third and Wells Fargo. According to Plaintiff, the missing checks might have revealed whether "Debtors exploited RRR as

---

[85] Doc. No. 80, pp. 7-8.
[86] Doc. No. 80-1.
[87] Doc. No. 80, p. 7.
[88] *Id.*

a mere conduit to conceal personal assets."[89] But Plaintiff does not identify any specific checks listed in the bank records that would be relevant to the alleged dissipation, nor does Plaintiff identify which of the prepetition checks listed in Plaintiff's Demonstrative Aid are relevant to this contention.[90]

Additionally, Plaintiff presented no evidence on the issue of whether copies of checks were in Debtors' possession or whether copies of checks had *ever* been in Debtors' possession. The Court notes that under modern banking practices, many bank account holders do not receive paper bank statements, let alone copies of checks written on and deposited into their accounts.

Finally, although it appears undisputed that Debtors did not produce a 2017 income tax return in this litigation, Plaintiff did not present any evidence that Debtors actually prepared and filed a return for that year, or that they received a refund for the 2017 tax year and concealed it from Plaintiff and the Chapter 7 Trustee. And when considered in relation to the volume of information that Debtors did produce,  the Court finds that Debtors' failure to produce a 2017 income tax return does not make it impossible to ascertain their financial condition. And to the extent that Plaintiff complains that Debtors did not provide financial records dating prior to September 2017, the Court finds Debtors' testimony regarding the destruction of their books and records in Hurricane Irma—documented by photographs—to be credible.[91]

The evidence before the Court is that Debtors provided financial records, including profit and loss statements and bank records, to the Chapter 13 Trustee and the Chapter 7 Trustee. From the fact that the Chapter 7 Trustee—who served in both Debtors' and AH Homes' cases—filed a Report of No Distribution in Debtors' case, the Court infers that he was sufficiently able to ascertain their financial condition from the documents that Debtors provided to him. In short, the absence of the

---

[89] *Id.*
[90] Doc. No. 80-1.
[91] Debtors' Ex. 88.

2017 income return did not prevent the Chapter 7 Trustee from administering the estate and did not prevent the Court from understanding Debtors' financial affairs.

      *c.*      *Count III – 11 U.S.C. § 727(a)(4)*

Under § 727(a)(4), the Court shall grant the debtor a discharge unless the debtor made a false oath in the case.[92] For a debtor's discharge to be denied under § 727(a)(4), a plaintiff must prove that a false oath was (1) fraudulently made, and (2) related to a material fact.[93] As to the first element, fraudulent intent can be inferred from the totality of the circumstances, but should not be applied to minor errors.[94] As to the second element, a fact is material if it bears a relationship to the debtor's business transactions or estate, or concerns the discovery of assets or business dealings.[95]

In its Post-Trial Brief, Plaintiff asserts that Debtors fraudulently undervalued the Insurance Claim and falsely stated that the Insurance Claim belonged to RRR,[96] that Debtors falsely stated that they had transferred the Naples Lots to Mercedes Medina and the South Carolina Property to Belkis Delgado,[97] and that Debtors concealed their income derived from RRR by opening the BB&T account in April 2018.[98] The Court finds Plaintiff has not met its burden under § 727(a)(4).

      *1.*      *The Insurance Claim*

First, as to the Insurance Claim, Plaintiff alleges that Debtors falsely disclosed on their original schedule of assets that RRR had a "possible $20,000 insurance claim for hurricane damage." But Plaintiff did not show that the statement was fraudulent. Debtors explained that they believed RRR— not AH Homes—was the entity entitled to the Insurance Proceeds because RRR was the only business

---

[92] 11 U.S.C. § 727(a)(4).

[93] *In re Rancourt*, 2014 WL 504082, at *4(citing *Swicegood v. Ginn*, 924 F.2d 230, 232 (11th Cir. 1991) and *In re Ingersoll*, 124 B.R. 116, 122 (M.D. Fla. 1991)).

[94] *In re Rancourt*, 2014 WL 504082, at *4(citations omitted).

[95] *In re Rancourt*, 2014 WL 504082, at *4(quoting *In re Chalik*, 784 B.R. 616, 618 (11th Cir. 1984)).

[96] Doc. No. 80, pp. 11-16.

[97] Doc. No. 80, pp. 16-17.

[98] Doc. No. 80, pp. 18-24.

operating at the Showroom when the hurricane damage occurred.[99] Specifically, Debtors assert that the insurance policy was in AH Homes' name because AH Homes previously operated out of the Showroom, but that after Mr. Su took control of AH Homes in the summer of 2017, AH Homes no longer operated out of the Showroom, and that Plaintiff knew that RRR was operating out of the Showroom.

Additionally, Debtors explained that they valued the Insurance Claim at $20,000.00 on their initial schedules because that was the estimate given to them by the insurance adjuster upon whom they relied to process the claim.[100] Debtors disclosed the Insurance Proceeds received by RRR in their Third Amended Schedule A/B, and stated that RRR had used the proceeds to pay its debts.[101] Debtors further testified that they provided the Chapter 7 Trustee with information about the Insurance Claim and how the Insurance Proceeds were used.[102]

Finally, Plaintiff failed to show that Debtors' disclosure of the Insurance Claim in their original schedules was material to Debtors' case. The evidence shows that AH Homes and Design Center—not Debtors—were the named insureds on the policy, and that the settlement checks were payable to AH Homes and Design Center.[103] If Debtors had disclosed the Insurance Claim as an asset of AH Homes, it may have been administered by the Chapter 7 Trustee in AH Homes' own Chapter 7 case[104] (the same Chapter 7 Trustee as in Debtors' case), but it would not have resulted in any recovery in Debtors' individual case.

Plaintiff may contend that the Insurance Proceeds should have been administered by the Chapter 7 Trustee in the AH Homes case, in which Plaintiff was a scheduled creditor. But if Debtors

---

[99] Doc. No. 81, p. 7.
[100] Doc. No. 44, ¶ 14; Doc. No. 81, p. 6.
[101] Debtors' Ex. 24, p. 10.
[102] Doc. No. 44, ¶ 14; Debtors' Ex. 95.
[103] Plaintiff's Ex. 2.
[104] Case No. 9:18-bk-01399-FMD.

satisfied the Chapter 7 Trustee, as they have testified here, that (a) that the hurricane damages were not incurred by AH Homes, but by RRR, and (b) that RRR used the bulk of the Insurance Proceeds to pay its own obligations, there would have been no reason for the Chapter 7 Trustee to attempt to recover the Insurance Proceeds for benefit of AH Homes' creditors.

In its Post-Trial Brief, Plaintiff cites *In re Murphy*,[105] as holding that a Chapter 7 trustee's failure to follow up or ask the debtor for additional information does not create a presumption of sufficiency.[106] But the facts in *Murphy* were very different from those presented here. In *Murphy*, the trustee "had decided to stop accepting new Chapter 7 cases, was rotating off the trustee panel, and was more interested in closing existing cases than in pursuing assets for administration,"[107] and the debtor was an "educated and sophisticated business man" who was "proficient in working with attorneys, accountants, and business professionals."[108] The debtor in *Murphy* had been involved in at least four corporate bankruptcy cases prior to filing his own case and the issues in his case involved his personal financial statements showing a net worth exceeding $24 million and a valuable art and jewelry collection.[109]

Here, Plaintiff presented no evidence on the issues of Debtors' sophistication or business acumen or the Chapter 7 Trustee's lack of interest in pursuing estate assets to administer for the benefit of creditors. And, it is important to note that, unlike the trustee in *Murphy*, Chapter 7 trustees have every incentive to administer assets of the estate because under § 326(a), their compensation is based on a percentage of the moneys they disburse to creditors.

---

[105] 2007 WL 3054989 (Bankr. M.D. Fla. Oct. 16, 2007).
[106] Doc. No. 80, p. 6.
[107] *In re Murphy*, 2007 WL 3054989, at *15.
[108] *Id.* at *1.
[109] *Id.* at *2 and *3.

2.      *Assignments of the Land Sale Contracts*

Second, with respect to the Assignments of the Land Sale Contracts, Plaintiff asserts that Debtors falsely stated on their SOFA that they had assigned their interest in the Naples Lots to Mrs. Delgado's mother, and that they had assigned their interest in the South Carolina Property to Mr. Delgado's mother. Plaintiff contends that the statements are false because "the assignments were never actually effectuated." Specifically, Plaintiff contends that the Assignments were not effective because Debtors did not obtain the Dewrells' prior consent to the transfers.[110]

The Court finds that Plaintiff did not meet its burden to establish that Debtors made a false statement on their SOFA or that their statements were made with fraudulent intent. First, it was AH Holdings—not Debtors individually—that entered into the Land Sale Contracts to purchase the properties. Second, Mr. Delgado did, in fact, sign the Assignments on February 1, 2018, pursuant to which  "Andrew Hunter Holdings, LLC/Andrew Delgado" assigned the Land Sale Contracts to the transferees.[111] And, third, and most importantly, Debtors' disclosures of the Assignments put the Chapter 7 Trustee and creditors on notice of the existence of the Land Sale Contracts and the Assignments.

With respect to the South Carolina Property, Plaintiff contends that Debtors' disclosure of the transfer to Mr. Delgado's mother was fraudulent because Debtors made "numerous payments . . . toward the property long after [January 2018]."[112] To support this contention, Plaintiff cites three checks that include notations referencing the South Carolina Property:  a check dated May 4, 2018, from Joint Fifth Third Account #3941 to Tony Mize in the amount of $880.00, possibly for landscaping services; a check dated May 5, 2018, from Joint Fifth Third Account #3941 to Jason Neal

---

[110] Doc. No. 80, pp. 16-17.
[111] Plaintiff's Ex. 3, pp. 9-10; Debtors' Ex. 94, p. 11.
[112] Doc. No. 80, p. 17.

for $2,900.00, for "air conditioning;" and a check dated September 1, 2018, from Mrs. Delgado's Fifth Third Account #3612 to Georgia Water & Well for $51.82.[113]

But Debtors testified that they wrote these checks (between two and six months *after* they filed their Chapter 13 bankruptcy case) to assist Mr. Delgado's mother in maintaining the South Carolina Property. And although the evidence shows that Debtors paid installment payments to the sellers on the Land Sale Contract for the South Carolina Property of $2,000.00 per month for the months of September through December of 2017,[114] there is no evidence that they made any payments to the sellers after Mr. Delgado signed the Assignment of that Land Sale Contract on February 1, 2018.

Additionally, Debtors' disclosure of the Assignments has nothing to do with the possibility that the transfers themselves were fraudulent. There is no evidence that the *disclosure* of the transfers in Debtors' initial SOFA was intended to hinder or defraud Plaintiff or to hinder the Chapter 7 Trustee in the administration of the estate. The Court gives little weight to Plaintiff's contention that the disclosures were fraudulent because the Dewrells later contested the validity of the Assignments of the Naples Lots.

Finally, Plaintiff did not show that Debtors' disclosure of the Assignments was material. AH Holdings entered into the Land Sale Contracts, not Debtors, and the Assignments were executed by "Andrew Hunter Holdings, LLC/Andrew Delgado."[115] Even if the Land Sale Contracts had belonged to Debtors individually, Plaintiff presented no evidence that value of the Land Sale Contracts exceeded the remaining balances due.[116]

---

[113] Plaintiff's Ex. 6, pp. 283, 311, 319.
[114] Plaintiff's Ex. 6, pp. 269-276.
[115] Plaintiff's Ex. 3, pp. 9-10; Debtors' Ex. 94, p. 11.
[116] Doc. No. 80, pp. 16-18. For example, a balloon payment in the amount of $63,000.00 was due on March 1, 2019, for the South Carolina Property (Debtors' Ex. 94, p. 3).

In summary, the evidence is that Mr. Delgado executed Assignments of Land Sale Contracts that had been entered into by AH Holdings and that had no proven—or even alleged—value to Debtors' bankruptcy estate. The Court finds that nothing about the disclosure of the transfers on their SOFA equates to a materially false oath.

### 3.    Income from RRR

Third, Plaintiff asserts that Debtors made a false oath with respect to their income because Debtors did not disclose the existence or use of RRR's BB&T Account #1122 at their Rule 2004 examinations in May 2018.[117]

RRR previously had used Wells Fargo Account #5507 as its operating account and payroll system. When Account #5507 was garnished by a judgment creditor of AH Homes, RRR opened a new account at BB&T, Account #1122.[118] RRR made its first deposits into the BB&T account when it was opened on April 11, 2018, more than a month after Debtors' bankruptcy filing.[119]

In its Post-Trial Brief, Plaintiff asserts that Debtors were not forthright at their Rule 2004 examinations regarding deposits into and payments out of the BB&T Account #1122. For example, Plaintiff challenges Mr. Delgado's deposition testimony that:

> [W]e tried to open up an account; I don't know the name of the bank. We tried to open it up there, but because this guy called us – you'll have to ask my wife what she did with that bank. It was a Latin lady. The name of the bank is Barkett or – started with a B. Because we thought this was going to last forever, but they lifted it so we're probably going to close that and stay with Well Fargo.[120]

The Court finds that Mr. Delgado's testimony lacks complete credibility because he had signed the BB&T signature card and been using Account #1122 for more than a month at the time of

---

[117] Doc. No. 80, pp. 18-24.
[118] Doc. No. 81, pp. 10-11.
[119] Plaintiff's Ex. 4.
[120] Plaintiff's Ex. 8, Transcript pp. 113-14.

his 2004 examination, but his statements are neither patently false nor are they material to the Chapter 7 case.

The evidence is that Mr. Delgado opened RRR's BB&T Account #1122 because RRR's Wells Fargo Account #5507 had been garnished. Critically, the opening of RRR's BB&T Account #1122 and the activity within the account relate to postpetition financial matters, not Debtors' prepetition financial affairs. Plaintiff did not show that the postpetition operation of RRR had any impact on the administration of Debtors' bankruptcy estate or that Debtors' testimony regarding the account was material to their bankruptcy estate.

    *d.*    *Count IV – 11 U.S.C. § 727(a)(5)*

Under § 727(a)(5), the Court shall grant the debtor a discharge unless the debtor failed to explain satisfactorily any loss of assets or deficiency of assets to meet his liabilities.[121] For a debtor's discharge to be denied under § 727(a)(5), a plaintiff must prove that "(1) at a time not too remote from the commencement of the case, the debtor owned a substantial, identifiable asset; (2) that on the date of filing the bankruptcy petition, the debtor no longer owned the particular asset; and (3) that the debtor was unable to satisfactorily explain the non-existence of the asset when called upon to do so."[122] A satisfactory explanation is one that convinces the judge.[123]

In its Amended Complaint, Plaintiff alleges in Count IV that Debtors could not explain "all of their income through RRR."[124] In its Post-Trial Brief, Plaintiff asserts that on February 8, 2018, Debtors had a combined total of $19,023.36 in Joint Fifth Third Account #3941 and Mrs. Delgado's separate Fifth Third Account #3612, but that Debtors disclosed only $300.00 in the accounts as of the

---

[121] 11 U.S.C. § 727(a)(5).

[122] *In re Rancourt*, 2014 WL 504082, at *5 (quoting *In re Fasolak*, 381 B.R. 781, 792 (Bankr. M.D. Fla. 2007)(citing *In re Hawley*, 51 F.3d 246, 249 (11th Cir. 1995)).

[123] *In re Rancourt*, 2014 WL 504082, at *5 (citing *In re Chalik*, 784 B.R. 616, 619 (11th Cir. 1984)).

[124] Doc. No. 29, ¶¶ 58-59.

March 7, 2018 Petition Date.[125] Consequently, Plaintiff contends that Debtors failed to satisfactorily explain the loss of $19,023.36 in the month before the bankruptcy filing.

The Court finds that Plaintiff has not met its burden under § 727(a)(5). The Fifth Third bank statements for the period from February 8, 2018 to March 7, 2018 are in evidence.[126] The statements show all of the deposits and withdrawals to and from Joint Account #3941 and Mrs. Delgado's Account #3612 during that period. The largest transfers from Joint Account #3941, such as online transfers totaling $13,400.00 on February 8, 2018, are to Mrs. Delgado's Account #3612. Withdrawals or debits totaling $8,368.12 were made from Mrs. Delgado's account, primarily for daily expenses or purchases, in the one-month period. Additionally, checks totaling $12,918.25 were written on Mrs. Delgado's account during that period. The largest check was for $2,395.00 to Debtors' bankruptcy counsel on February 21, 2018.[127]

The information Debtors provided on their bankruptcy schedules—that they had four dependents, a monthly rent payment of $2,200.00, food expenses of $1,000.00 per month, monthly health insurance premiums of $2,857.62, monthly car insurance premiums of $989.00, and car payments on three cars, not to mention the payments on the Land Sale Contracts—explains how Debtors spent their money.

In reviewing Debtors' bankruptcy schedules and the bank records for Fifth Third Joint Account #3941 and Mrs. Delgado's Account #3612, the Court finds that Plaintiff did not prove Debtors' failure to explain the loss of any specific funds in the Fifth Third accounts.

---

[125] Doc. No. 80, pp. 24-25.
[126] Plaintiff's Ex. 6, pp. 51-51 and 120-25.
[127] Plaintiff's Ex. 6, pp. 316-17.

### D.    Conclusion

The Court acknowledges that Debtors' financial affairs are confusing at best. Debtors operated three different corporate entities, RRR, Design Center, and AH Homes, and conducted their business and personal affairs from at least four different bank accounts,[128] frequently making transfers among the accounts and reimbursing themselves for business expenses.

And the evidence in this case does not present a perfectly clear picture of Debtors' financial transactions in the months before the Petition Date. For example, no explanation was provided as to the status of Debtors' 2017 tax return, Debtors' unscheduled ownership interest in Design Center, or the timing of the Assignments of the Land Sale Contracts shortly after Debtors had consulted a bankruptcy attorney. And Plaintiff is no doubt frustrated about the time, effort, and costs it expended to obtain Debtors' and RRR's bank records from Wells Fargo, Fifth Third, and BB&T despite there being no evidence that Debtors were in physical possession of those records.

However, at the end of the day, Plaintiff did not present evidence to the Court that Debtors fraudulently concealed assets or information or that Debtors' Assignments of the Land Sale Contracts were intended to hinder, delay, or defraud Plaintiff, other creditors, or the Chapter 7 Trustee.

A plaintiff's burden of proof under § 727(a) is a heavy one,[129] and "[t]he reasons for denying a discharge . . . must be real and substantial, not merely technical and conjectural."[130] Here, for the reasons set out above, the Court finds that Plaintiff did not meet its burden of proof by a

---

[128] Fifth Third Joint Account #3941, Mrs. Delgado's Fifth Third Account #3612, RRR's Wells Fargo Account #5507, and RRR's BB&T Account #1122.

[129] *In re Schermer*, 59 B.R. 924, 925 (Bankr. W.D. Ky. 1986)("The Code places a heavy burden of proof on the party objecting to a debtor's discharge.")(also citing *In re Brame* 23 B.R. 196, 200 (Bankr. W.D. Ky. 1982)("The measure of proof required to establish [a 727 case] . . . is a most exacting one.").

[130] *In re Miller*, 39 F.3d 301, 304 (11th Cir. 1994)(quoting *In re Tully*, 818 F.2d 106, 110 (1st Cir. 1987) and *Dilworth v. Boothe*, 69 F.2d 621, 624 (5th Cir. 1934), and quoted in *In re White*, 568 B.R. 894, 909 (Bankr. N.D. Ga. 2017)).

preponderance of the evidence to bar Debtors' discharge under 11 U.S.C. §§ 727(a)(2), 727(a)(3), 727(a)(4), or 727(a)(5).

Accordingly, it is

**ORDERED:**

1.      The discharge of Debtors, Andrew Oscar Delgado and Ivette Mercedes Delgado, is not denied pursuant to 11 U.S.C. § 727(a).

2.      A separate Final Judgment will be entered in favor of Debtors, Andrew Oscar Delgado and Ivette Mercedes Delgado, and against Plaintiff, Crystal Blue, LLC.

The Clerk's Office is directed to serve a copy of this Order on interested parties.